# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JAMES COOPER,

    Petitioner,    Case Number: 5:16-CV-11125
              HONORABLE JOHN CORBETT O'MEARA

v.

CARMEN PALMER,

    Respondent.
              /

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY

This matter is before the Court on Petitioner James Cooper's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted of assault with intent to murder, MICH. COMP. LAWS § 750.83, torture, MICH. COMP. LAWS § 750.85, and first-degree home invasion, MICH. COMP. LAWS § 750.110a(2). Petitioner raises four claims for habeas corpus relief. Respondent, through the Attorney General's Office, has filed an answer in opposition arguing that one of Petitioner's claims is procedurally defaulted and that all of the claims lack merit. The Court finds no basis for habeas corpus relief and denies the petition.

**I.  Background**

Petitioner's convictions arise from the assault of Henry Merritt at his home in Adrian, Michigan on December 30, 2012. The Michigan Court of Appeals described the evidence adduced at trial as follows:

In December 2012, the victim, Henry Merritt, allowed his adult daughter, Jessica Tabernero, and her daughter to live in his home with him. Tabernero had a bad drug addiction. After her work ended at a local bar in the early morning hours of December 30, 2012, Tabernero went to the home of defendant's brother-in-law, Eric Williams, where defendant also lived, and began using crack cocaine. Also present were defendant; defendant's wife, Leah Cooper; Williams; and Jessica Miller. All were, and had been, ingesting significant amounts of crack cocaine. Soon after her arrival, defendant asked Tabernero to have sex with Leah as a birthday present to her; she agreed, and after doing so she exited the room and began showing signs of overdosing. While in that condition she stated that her father had raped her. Hearing this, defendant asked for her father's name and address, left the house and picked up Leondre McCarver, defendant's drug supplier, and proceeded to Merritt's home.

Thus, in the early morning of December 30, 2012, Merritt heard a noise that sounded like a loud boom coming from his kitchen. Merritt went to his kitchen and saw two men, a black man and a white man. Merritt identified the white man as defendant, though he had never seen either man before.[1] Merritt asked the two men why they were in his home, to which they responded, "'We're here to do a job.'" After this interaction, Merritt was "subdued by both of them and beat unmercifully around [his] face area." The men then took Merritt to his bedroom, where defendant accused Merritt of having sex with Tabernero. Merritt told them that he did not have sex with his daughter,[2] but that his ex-wife's husband had done so.

Undeterred by Merritt's statement, both men continued to beat and choke Merritt while also continuing to accuse him of having sex with Tabernero. Defendant told Merritt that if he had "anything to do with sex" in his home, defendant was going to kill him. After this, Merritt was in and out of consciousness. Eventually, the two men dragged Merritt to the bathroom, "[f]orcibly," with a belt around his neck. Defendant and McCarver continued to beat Merritt in the bathroom.

Defendant then put Merritt in the bathtub, continued punching Merritt, and told McCarver to get a gas can that was just outside Merritt's house. Defendant then doused Merritt with gasoline and said, "'You're going to feel it, you're going to feel the wrath of me, you're going to feel the pain.'" Defendant then lit Merritt on fire. Merritt's neck was the only part of his body that caught on fire.

Merritt prayed "the whole time out loud and to [himself] asking God to help [him]...." The pain from the fire was indescribably hot, and Merritt endured the heat until the gasoline burned itself out. To help with the pain, Merritt turned on the shower. Defendant reacted violently after Merritt turned on the water, punching him repeatedly. After that, defendant repeatedly hit Merritt's head with a hammer. Merritt was lit on fire again, burning his neck and upper back. Eventually, defendant and McCarver left the bathroom, and Merritt moved a dresser to block the bathroom door. However, both men obtained reentry after they broke the door down.

Eventually, defendant and McCarver left. The damage to Merritt's body was horrific. His middle finger was sliced off and he was stabbed in the arm either with a knife or the claw of a hammer. Merritt's arm was broken, his neck and the top part of his shoulders were burnt, and his face was bloody and swollen. Before getting help for his injuries, Merritt went downstairs in his home to smoke a cigarette. After he finally[3] lit the cigarette, Merritt went outside and called for help; Merritt's neighbors, Laurie Damon and Tori Helsel, came to his rescue. Both testified that his injuries were so horrific that they were surprised that he could talk. Merritt was evacuated by helicopter to a hospital.

___

[1]Merritt was shown a photo array before trial and selected defendant without hesitation.

[2]Tabernero subsequently indicated that this was true. Merritt had not raped her.

[3]Despite being soaked in gasoline, Merritt did not catch himself on fire. When asked if he was able to light his cigarette, Merritt explained: "Yeah, but my finger that was cut off, hanging off, the end of my finger, by doing this it put it out, the cigarette out." The blood from Merritt's missing finger was putting the cigarette out.

*People v. Cooper*, 309 Mich. App. 74, 76-79 (Mich. Ct. App. Jan. 22, 2015).

Following a jury trial in Lenawee County Circuit Court, Petitioner was convicted of assault with intent to murder, torture, and first-degree home invasion. On August 14, 2013, Petitioner was sentenced as a twelfth-offense habitual offender to 320 to 640

months' imprisonment for first-degree home invasion, life imprisonment for assault with intent to commit murder, and 900 to 1,800 months' imprisonment for torture.

Petitioner filed an appeal of right in the Michigan Court of Appeals raising these claims: (i) defense counsel was ineffective in eliciting testimony regarding Petitioner's alleged drug dealing and prior assault of a prosecution witness; (ii) the prosecutor improperly vouched for the credibility of prosecution witnesses and defense counsel was ineffective for failing to object; and (iii) defense counsel was ineffective in failing to cross-examine accomplice about plea agreement. Petitioner also filed a motion for remand. The trial court granted the motion to remand to allow Petitioner to file a motion for new trial and for the trial court to conduct an evidentiary hearing on the ineffective assistance of counsel claims. *People v. Cooper,* No. 318159 (Mich. Ct. App. May 6, 2014), ECF No. 8-11, Pg. ID 1036. Following an evidentiary hearing pursuant to *People v. Ginther*, 390 Mich. 436 (1973), the trial court denied the motion for new trial. 7/30/14 Op. & Order, ECF No. 8-11, Pg. ID 1184-1190. The Michigan Court of Appeals then affirmed Petitioner's convictions. *Cooper*, 309 Mich. App. at 91. The Michigan Supreme Court denied Petitioner's application for leave to appeal. *People v. Cooper*, 498 Mich. 896 (Mich. 2015).

Petitioner then filed the pending habeas petition. He raises these claims:

I. Defense trial counsel was constitutionally ineffective in failing to object to, or actually eliciting, irrelevant and unfairly prejudicial evidence that appellant was involved in drug dealing and had assaulted a prosecution witness.

4

II. Ineffective trial counsel for eliciting testimony that I assaulted a prosecution witness.

III. Prosecutor vouched for witness testimony.

IV. Ineffective trial counsel for failing to cross examine alleged accomplice about facing life.

**II. Standard**

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, a state prisoner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 408. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established

5

federal law erroneously or incorrectly." *Id.* at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Id.*

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. *Id.* Indeed, "Section 2254(d) reflects

the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979)) (Stevens, J., concurring)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103, 131 S. Ct. at 786–87.

Additionally, a state court's factual determinations are entitled to a presumption of correctness on federal habeas review. See 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III. Discussion

### A. Ineffective Assistance of Counsel Claims

Petitioner's first, second, and fourth claims raise allegations of ineffective assistance of counsel. Petitioner argues that his defense attorney's performance was deficient because counsel: failed to object to and elicited irrelevant and prejudicial testimony regarding Petitioner's drug dealing; elicited testimony that Petitioner previously assault a prosecution witness; and failed to cross-examine Leondre McCarver.

The AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, — U.S. — , 134 S.

7

Ct. 10, 16 (2013). The standard for obtaining relief is "'difficult to meet.'" *White v. Woodall*, — U.S. —, 134 S. Ct. 1697, 1702 (2014), *quoting Metrish v. Lancaster*, 569 U.S. —, —, 133 S. Ct. 1781, 1786 (2013). In the context of an ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984), the standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable"; but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

An ineffective assistance of counsel claim has two components. A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. To establish deficient representation, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." Id. at 688. In order to establish prejudice, a petitioner must show that, but for the constitutionally deficient representation, there is a "reasonable probability" that the outcome of the proceeding would have been different. *Id.* at 694.

In his first ineffective assistance of counsel claim, Petitioner argues that his attorney erred in eliciting testimony from prosecution witness Laurie Damon that she knew Petitioner from her "past" because her child's father, Mike Wotring, had purchased pills from Petitioner. She had never met Petitioner in person, but was sure he was the same person who had given pills to Wotring a decade earlier. At the *Ginther* hearing,

8

defense counsel testified that he did not consider Damon a critical witness and thought that she had Petitioner confused with someone else. Defense counsel explained that he elicited this testimony from Damon in an attempt to show that she never actually met Petitioner and may have been confused. Defense counsel acknowledged that he was unable to show that Damon was mistaken in her belief that Petitioner was the person who sold pills to Wotring. The Michigan Court of Appeals held that counsel's decision to elicit this testimony was not ineffective. *Cooper*, 309 Mich. App. at 81-82. Defense counsel had a sound trial strategy for eliciting this testimony – an attempt to discredit Damon as a witness. *Id.* In addition, in a statement to police detective Luann Bearden, Petitioner admitted that he used a lot of crack cocaine on the night of the attack. Thus, his involvement with drugs was before the jury on his own statement. *Id.* He was not prejudiced by the brief reference to drug activity a decade before his crimes. "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Petitioner has not shown that the decision of the state court was contrary to or an unreasonable application of *Strickland*.

Next, Petitioner argues that his defense counsel was ineffective in failing to object to the prosecutor's questioning of Detective Bearden regarding searches of two residences with which Petitioner was associated and the recovery of narcotics from at least one of the residences. The Michigan Court of Appeals held that Petitioner could not show that he was prejudiced by this testimony because of Petitioner's own admissions that he used

9

drugs. *Cooper*, 309 Mich. App. at 82-83. This Court agrees. In light of Petitioner's statement admitting to drug use and the overwhelming evidence against Petitioner, the Court discerns no way in which the absence of this testimony would have created a reasonable probability of a different result. Habeas relief is denied on this claim.

Petitioner also challenges defense counsel's handling of defense witness Jessica Miller. Petitioner alleges that defense counsel opened the door to Miller testifying that Petitioner had previously assaulted her when she was high on drugs. The Michigan Court of Appeals reviewed defense counsel's *Ginther* hearing testimony and found no ineffectiveness:

> Pursuant to defense trial counsel's questioning, Miller testified that she had worried, in the past, about her safety whenever she did drugs with defendant because defendant had assaulted her when she was high on crack cocaine. At the *Ginther* hearing, defense trial counsel explained that his strategy in questioning Miller was to attack her credibility by focusing on her drug use, particularly her heavy use of crack cocaine, and how it impacted her perception. Also, defense trial counsel explained the decision and strategy in questioning Miller about the time defendant assaulted her:
>
>> I discussed with Mr. Cooper the down side to asking those types of questions. I had some interaction with Miss Miller, I had interviewed her and I had also seen different recorded statements and she was hysterical and her statements often shifted. And part of [the discussion] about the prior alleged assault by Mr. Cooper was to show that she was hysterical and that she, and this was something that Mr. Cooper kind of relayed to me, that she remembered things in this kind of grandiose way and that, you know, after she was not high for a while, that maybe she would remember that it didn't quite happen the way that she perceived it to at the time. So what we were trying to show, and I had actually talked to Miss Miller a little bit about it, is that—is that there was an assault and that the assault that—well, that there wasn't an assault;

> that she believed there was an assault and played it up in her head but now that she was sober she realized that that's not exactly what had happened and that she was hysterical at the time that this thing—these things were going on. We were trying to attack her credibility.
>
> As part of this strategy, trial counsel also elicited testimony from Miller that she was bipolar.
>
> Defense trial counsel's questioning of Miller did allow Miller to testify about her fear of defendant because he had previously assaulted her. However, this was a consequence of the overall trial strategy in questioning Miller—which was to point out Miller's heavy use of drugs and how it affected her perceptions. "A failed strategy does not constitute deficient performance." *People v. Petri*, 279 Mich. App. 407, 412, 760 N.W.2d 882 (2008). Thus, defense trial counsel's performance did not constitute ineffective assistance.

*Cooper*, 309 Mich. App. at 83-84.

The record supports the Michigan Court of Appeals' holding that defense counsel's decision to cross-examine Miller about her claim that Petitioner assaulted her was made at the urging of Petitioner and in furtherance of an attempt to impeach Miller. Counsel was able to elicit testimony that Miller had a diagnosed mental disorder and that she used illicit drugs. The record supports the Michigan Court of Appeals' decision that counsel's cross-examination of Miller was based upon a reasonable strategic decision. Moreover, Petitioner has not shown that he was prejudiced by this testimony. Habeas relief is denied on this claim.

Petitioner next argues that counsel was ineffective in failing to object to Leondre McCarver's testimony that Petitioner was his best customer and purchased $500 to $1,000 worth of crack cocaine from him each day. At the *Ginther* hearing, defense

11

counsel testified that he did not object to this testimony because he felt that the estimate of $500 to $1,000 a day was so high as to be ridiculous. He believed that allowing that testimony hurt McCarver's credibility. The Michigan Court of Appeals held that defense counsel's decision not to object was reasonable trial strategy because it provided him a means of challenging McCarver's credibility. *Cooper*, 309 Mich. App. at 85. The state court's decision was not contrary to or an unreasonable application of Supreme Court precedent. The evidence against Petitioner was very strong and his defense weak. Defense counsel had to proceed within the limitations presented by the circumstances of the case. Habeas relief is denied on this claim.

Finally, Petitioner argues that defense counsel was ineffective in failing to cross-examine McCarver about the plea agreement he received in exchange for his testimony. McCarver testified on direct examination that the plea agreement reduced the charges he had been facing down to one felony charge that carried a maximum penalty of ten years' imprisonment. Petitioner argues that defense counsel should have cross-examined McCarver about the life sentence he would have faced had the plea agreement not been entered and the other charges dismissed.

Defense counsel explained during the *Ginther* hearing that he did not cross-examine McCarver on his plea bargain because that information was already before the jury and he already had introduced in his opening statement the motives that certain witnesses had for testifying. The Michigan Court of Appeals held that, even assuming that defense counsel should have cross-examined McCarver on this point, Petitioner could

12

not show that he was prejudiced by counsel's error. *Cooper*, 309 Mich. App. at 86-87. The record fully supports this finding because the jury was aware of the plea agreement, if not all of its terms, and because the evidence against Petitioner was overwhelming. The jury was aware that McCarver testified pursuant to a plea agreement that reduced the crimes with which he was charged, and the implication that he may have been testifying to save himself. Merritt positively identified Petitioner as the person who assaulted him. Jessica Miller testified that Tabernero gave Petitioner her father's address after telling everyone that her father had sexually assaulted her. Before leaving, Petitioner told Tabernero she would not have to worry about her father anymore. Miller also testified that she answered a phone call on Tabernero's cell phone later in the evening. It was Petitioner calling and he asked to speak to Tabernero. After Tabernero spoke to Petitioner she handed the phone back to Miller. Miller heard Petitioner say, "This is what it sounds like when my hand's around his throat." Tr. II, at 158. She also heard Merritt say, "I swear I would never do that to my daughter." *Id.* at 159. Given all of this evidence, Petitioner has failed to show that he was prejudiced by counsel's failure to cross-examine McCarver on the specific reduction in sentence exposure he received as part of his plea deal. Habeas relief is denied.

### B. Prosecutorial Misconduct Claim

Finally, Petitioner seeks habeas corpus relief on the ground that the prosecutor engaged in misconduct by vouching for the credibility of two prosecution witnesses: Jessica Miller and Leondre McCarver. Respondent argues that this claim is procedurally

defaulted. "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003), citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the Court finds that the interests of judicial economy are best served by addressing the merits of this claim.

The prosecutor elicited testimony from prosecution witnesses Jessica Miller and Leondre McCarver that each had pleaded guilty pursuant to plea agreements that required each to provide truthful testimony. The Michigan Court of Appeals held that the prosecutor's questions were not improper because the prosecutor did not intimate that he had some special information, not disclosed to the jury, that the witness was testifying truthfully or make any additional comments about these witnesses' credibility. *Cooper*, 309 Mich. App. at 90-91.

The "clearly established Federal law" relevant to a habeas court's review of a prosecutorial misconduct claim is the Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *Parker v. Matthews*, 567 U.S. 37, —, 132 S. Ct. 2148, 2153 (2012). In *Darden*, the Supreme Court held that a "prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id. quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). This Court must ask whether the Michigan

14

Court of Appeal's decision denying Petitioner's prosecutorial misconduct claims "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* at 2155, *quoting Harrington*, 562 U.S. at 103.

"'Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness.'" *U.S. v. Trujillo*, 376 F.3d 593, 607 (6th Cir. 2004), *quoting U.S. v. Martinez*, 253 F.3d 251, 253-54 (6th Cir. 2001). In *Trujillo*, the prosecutor asked one prosecution witness whether her plea agreement required her "truthful cooperation." *Id.* at 608. Another prosecution witness testified that her plea agreement required her to "tell the truth." *Id.* The Sixth Circuit Court of Appeals held that the prosecutor's questions to these two witnesses "merely encompassed the terms of [their] plea agreements which this Court has held to be permissible," and, therefore, did not amount to improper vouching. *Id.* at 609.

In this case, the prosecutor's examination of Miller and McCarver merely asked them to confirm the terms of their plea agreements. The prosecutor did not imply any specialized knowledge of whether the witnesses testified truthfully. The Michigan Court of Appeals' decision finding no misconduct is amply supported in the record.

## IV.    Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of

the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The substantial showing threshold is satisfied when a petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, the Court concludes that reasonable jurists would not debate the Court's conclusion that none of the claims in the habeas petition warrant relief. Therefore, the Court denies a certificate of appealability.

## V.  Conclusion

The petition for a writ of habeas corpus and a certificate of appealability are **DENIED** and the matter is **DISMISSED WITH PREJUDICE.**

**SO ORDERED**.

s/John Corbett O'Meara<br>United States District Judge

Date:  April 14, 2017

I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, April 14, 2017, using the ECF system and/or ordinary mail.

s/William Barkholz<br>Case Manager